Next case on the docket is Roger Speth v. Roger Roberts, DBA Pro Craft of Central Illinois. I recognize the signature, but I can't read it. Good morning, Your Honor. Good morning. Take your time. Mr. Blyer. Yes. Thank you, Your Honor. May I please have the court? Good morning, Your Honor. My name is Joe Blyer. I'm here representing Roger Roberts, DBA Pro Craft of Central Illinois. We were the defendant at the trial court. This is actually a cross appeal. We filed the first appeal, and we are therefore the appellants. It revolves around a trial that was both a bench trial and a jury trial in Jackson County. Giving you a factual basis of the case and the trial, and I think the whole appeal kind of goes down to the issues of this element of damages, what damages were proved or alleged or evidence at the trial court, or I should say lack of evidence of damages at proximate cause. But this process started, the plaintiff's in the case, the spouse, owned a home in rural Jackson County. It was a log home, which I'm sure all the courts are familiar with. It's made out of logs inside of it. It's stick built. Roger Roberts is a businessman from up in northern Illinois. He had a number of different businesses. He had a business called Pro Craft Ink that sold a liquid siding. I think that's what it was referred to. It's basically a spray-on gel coat, spray-on type of product that is used or sprayed on log homes to provide a shield or a coating to the log home and prevent the outside elements from attacking the log home or the logs themselves. Mr. Roberts and the Spess had some discussion over the telephone. There was some site investments or site inspections. Eventually, a contract was entered into between the Spess and Pro Craft Ink. That's important because Roger Roberts was the main defendant in the lawsuit and not Pro Craft Ink. Was that ever registered in the state of Illinois? Your Honor, we came up during the trial. I guess the bottom line is the defendant thought it was. But it wasn't? The Pro Craft Ink was. It was not registered. It started out in Colorado, came here, and it was not registered. We had some testimony at the trial about that as to what his accountant thought it was. But the bottom line is it was not. So why is he not personally the correct defendant? Well, Your Honor, I think that because he did not enter into the contract, our position is, and it was alleged in the plea that we denied it. There were some allegations in the reply brief that… Well, he was illegally doing business. He should have been doing business under his personal name if he wasn't registered, correct? That's the way he was, Your Honor. Yes. And he didn't sign in his corporate capacity on the contract? He signed. That's correct, Your Honor. He signed his own name? He signed in the contract. And from what I can tell, you didn't raise an affirmative defense in that regard? It had to, Your Honor. I raised it. You just denied it? I denied it. It's the allegations of the plaintiff to allege that the defendant that they sued is the proper defendant. I want to ask you about some discovery. Apparently, there was a request for the identity of any expertise. Yes. And the answer was something like, at this time, we don't have anybody and we'll supplement if we do. That is correct. So then, I gathered from your brief, that was never formally supplemented and that the only thing you got was this report about bids or bid for teardown and reconstruction. And how did that, the report, how were you given that? Was it pursuant to, with another supplemental discovery filing by the plaintiff? Your Honor, right off the top of my head, I don't know the specifics. If it was attached to a supplement, there's no question the Plaintiff's counsel provided it to me. But the court denied the use of that in its entirety, right? That is correct, but not on a issue of disclosure. Okay. It was on an issue of what their opinions were. Okay. And this, and the court picked up on it. And if you read the transcript of the trial court, we had a long discussion of it, and basically what this gets down to at the time of trial. And to kind of go back to your previous question, I raised that about the proper defendant, but I think regardless of how you find it, the big issue in this case is approximate cause and damages. That's the issue. I'm not going to sit here and say, hey, you should grant this because it's ProCraft Inc. and not Roger Roberts. I don't want to get into that because there's some issues he thought it was. Yeah, I don't think I'd go there if I was you. I'm not going to do this. And you know this is the last part of my brief. Okay. So, if you're done with those questions, I'll move on from that point too. Let's go. Okay. I do have a question. Yes. Moving on to what Justice Chapman was getting into. What do you believe the proper measure of damages was in this case, assuming liability? Your Honor, that's a tough question to answer, and I think that's what the trial court is, because we had no testimony. No, I'm just saying legally. What do you think? Legally? It would depend on what type of—I'm not going to avoid your question. I'm going to kind of get to it. It depends on how the plaintiff decided to proceed in this case at trial. Did you have an expert to say, hey, I built these log homes. I can come in and do this, take it off for repair. That would be an element of damages. What did it cost to repair it? Did you have another expert that comes in and says, you know, I looked at this. There's no way to take this off, and you've got to take it off or the house is going to crumble. So the only element is, hey, I need to tear this house down and rebuild it. But you didn't even concede that it was caused by the application, did you? No. And that was another issue that Judge Somerson talked about in her argument is, is this an application problem? Is it a product problem? Well, I mean, either way, you would have been responsible, correct? I mean, you hired the applicator. Correct. Now, is it a product's case, though? Is it the product that caused it? Or is it the application? Am I responsible if it's the product? Well, under the warranty, though, it doesn't really make a distinction. All the warranty says is if at any time up to 25 years after the date of application, you will provide labor materials at no cost to the owner for any repairs. Any repairs. It doesn't talk about what caused it. It says the material is warranted for 25 years against chipping, flaking, or peeling. Do you think you need an expert to say that it's peeling? And this is what we got to. And Judge Somerson picked up on that. We need an expert as to what the repair is. Okay, but that's my question. Do you think an expert is needed to say that's peeling? Or do you think that's an opinion that can be given by a lay witness? Under a warranty, that's it. And we got to get an expert. Peeling, cracking, and the other language. Peeling, flaking, or chipping. Could a lay person say that? Yes, I believe a person can talk to me. I think someone can say, hey. We can all see it's chipping, flaking, and peeling. And I presume there were photographs. That's correct. And the court decided that the damage essentially was the difference between the amount that he paid, the $40,900, which would have been the value of either the contract, the product, or the application, if it were. It was the cost of the contract, the $40,900. Right. Well, didn't the court say that she was giving the cost of the contract, and additional damages would have been available, but there was no proof? Well, I can't remember specifically the wording of the order. I apologize for that. But she did give, but that's correct. That's what we talked about during the whole arguments on the directed verdict, the whole arguments on the warranty claim. Because if you recall, initially she was going to not grant it on the warranty claim. And then she came back in and says, you know, I'm struggling with this warranty claim. The warranty says, just in case you just pointed out what it says, but I'm still struggling with no testimony as to what the damages are, what the repair costs are. And that's the whole thing about this whole trial was, and that's the whole issue that Judge Salverson struggled with, was we never had anyone testify under the warranty account as to what it would cost to repair the flaking, whatever those items, you know, you said, Your Honor. And so therefore, that's why she then granted the directed verdict on the warranty claim. Right. She says there was no testimony as to cost of repair. Plaintiffs lost their contract pricing on $40,900. They are also entitled to cost of repair, however, no testimony was offered. Correct. I think you get both under circumstances like this. Do you think you get the cost of repair and the amount of money to fix if it can be fixed? Do you think that's a double recovery or not? Under which count, Your Honor? Consumer fraud. Consumer fraud. Well, the consumer fraud, I think you get the cost of repairs. And not the cost of contract. I'm sorry? And not the cost of contract. Well, I think it's – you look in, though, the consumer fraud is the actual damages to the plaintiff. So you'd be made whole by the cost of repairs. That's right. And that's right. The problem I had with this whole trial and the whole aspect of it was we never had anybody to testify that says, hey, this needs to be done because of this. And therefore, we're going to – and that's why if you look, Justice Chapman, when Judge Salk was talking about it, that the persons weren't allowed to testify. They were going to testify, hey, this is – it costs X dollars to tear this house down. It costs X dollars to rebuild this house. And there was even – But they didn't causally connect it to the injury. I apologize for talking over you. No, that's okay. I'm talking over you, too. I apologize. There was even a question asked in this pro-offer. I mean, it wasn't really a pro-offer. We were asking – the court was asking questions. Are they going to testify as to it has to be torn down because of A, B, or C? The answer was no. So therefore, there was no testimony. They didn't allow to testify because there was nothing in the court record, no evidence that, hey, it needed to be torn down because of the product or that was the only remedy. And that was the whole issue was, you know, I was thinking driving – this is a type of a case, you know, and there's some cases and we've all had them. If this was a car crash case and I'm driving down the road and someone hits me and I go to the emergency room and my arm's broken and I come in with a cast, I don't think I need a doctor to say, hey, I broke my arm from this car wreck and this is what the bill cost me to go to the emergency room. I think that could come in. But that's different than what we have here. I mean, we don't know that there's assumptions that the product was bad or that it was not put on properly or that there caused mold in the house or caused this, that, that. But we have no testimony that it did cause that. And then we don't have any testimony as to, hey, this is what it costs to repair this thing. And I think that's what Judge Solison was struggling with and eventually she finally just said, hey, as Justice Case just read from her opinion, we have no evidence of that. We have no evidence that it needed to be torn down. We have no evidence it can't be repaired. And if it did, we don't have any evidence as to what the cost of repair to repair it was. But then how does she get to giving them the money back for the cost of the product and application? Well, in my world, Judge, that's what I'm, I don't know. And that was, I put in my brief, that's kind of a. That's what I'm asking too. I mean, I don't know how she got to that point. I mean. She just gives them the contract price. Well, she went into that bargain. What was it? Bargain of the. Benefit of the bargain. Benefit of the bargain. Thank you. And. But in order to arrive at that conclusion, you have to say there was a bad bargain. That it caused the problems that they're alleging. Judge, I agree with you. And I'm hesitant to say this because I don't want to give the opportunity to affirm one and send it back to the other. They're kind of inconsistent. You know, saying there's no damages and then giving the award under the consumer fraud. I mean, saying there's no proven damages. And you look at all the consumer fraud, everything. One of the elements is always, and Avery all talked about, one of the elements is damage. What is the damage? Well, isn't it more a question of causation than damage? It's both. Well, but you don't get the damage unless you've got causation. That's correct. And that's what we had in this. That's what we had in the trial. We had neither anyone to testify as to causation. And then we had no one to testify as to the damages. On the other hand, I guess you would have if your contractor would have gone out and taken a look and performed under the warranty, trying to fix it. You wouldn't testify to that. Instead, he sat on his heels. Well, Judge. Or some other part of his physique. He didn't. He didn't sit on his heels, Your Honor. And the court was quite perceptive. I mean, he really ignored the people. Well, Judge, that was some testimony in trial. The plaintiffs want to say he did. Did he ever show up? Did he ever go back to the property? To the property? No. And the testimony was they called the applicator. He called ProCraft. And he testified that he thought ProCraft took care of the issue. I'm sorry. Oh, Mr. Rodgers. Mr. Rodgers called them outfitted in Nashville. And he testified in trial. He thought that they had taken care of the product. And they were all happy. I don't know if he said they were all happy. Well, I've just been somewhat ironic. I want to surmise that he thought that they were all happy. But nobody ever called him after he thought. That's what his testimony was, yes. And what's the other testimony? That they called him, called him, called him. That's what they said. You know, he said that they called him. There was peeling. He called outfitted in Nashville. And, remember, he testified in trial. He thought it was taken care of. I guess those are all credibility issues that the court determined. That's correct. That's correct. But I think, you know, the whole thing, both all the issues and both appeals deal with is, one, not just Kevin, causation and damage. And it's the greatest burden in this situation. You know, it would have been, I think, it could have been, I mean, it simply is saying, have a contractor say, hey, I've built law firms and this is what it is, and it's all this product and it needs to be poured out. Then the onus would have been on me to then come forward with someone that says otherwise. But until we have that type of evidence, there's nothing for me. I mean, I'm not under the ‑‑ I don't have to go to the next court to rebut something that's not there. Mr. Byer. Yes, ma'am. Yes, ma'am. Sorry. Sorry about that. When was your company given notice? Because I show that it was applied in 03 and the complaint was 06. Judge, I can't. Did this happen fairly quickly, as you recall, or not? Appealing the criminal? Appealing, Judge. And I apologize. I didn't make a time frame back then. The allegations are that it happened shortly. It happened shortly. Several weeks to a month. And I do remember coming out of the trial that Seth sent a letter shortly. And I apologize. I don't remember how much time after that. I'll ask them. That's fine. Hey, the house looks great. It's beautiful, blah, blah, blah. Right. And I apologize, Your Honor. I don't have a timeline in my head about when the application ‑‑ it took a long time to get the trial out. I don't remember those specific dates as to when it ‑‑ how long after the application that they started to develop these problems. But I do remember at the trial that we introduced the letter that she had written to my client saying what a wonderful job it was. But that was a few days after it was ‑‑ Your Honor, I apologize. I can't ‑‑ it's part of the record. The date of the letter is, and I can't ‑‑ I apologize to you that I can't tell you specifically the timeline, the time date. But I think it can be a sad case. Clients claim they have a house that they can't live in, they can't use. It needs some problems. It will eventually be problems. It needs some life repairs. But I think under the facts of the case, there was no damage and no proximate cause. And we'd ask that you affirm that granting the directed verdict in reverse the consumer fraud because of no damages. Thank you. All right. Mr. Sanders? Mr. Sanders, I presume that you believe that the court should have allowed in the report of damages. I do, Your Honor. And why is it you think it was error for the court to keep that out? Well, what essentially happened was the ‑‑ everybody agreed that the plaintiff could testify as to what they wanted for a limiting. Judge Soberson stated that on page 458 of the record. But who connected the problems with the problems that your client says the home was experiencing with the product or the application? I mean, don't you have to have a causal connection before you get to your remedy and your damages? I think you do. Okay. And I think, you know, you've only got two possibilities here. It's application or it's product. Well, you can just assume that it was cause ‑‑ how do you just assume that the problems with the house were caused by ‑‑ Quite a bit of testimony here. First of all, I think it's important that they had seven years to file an affirmative defense of product liability and didn't do that. So they went into court not able to claim that it was the product. Well, no, it's the plaintiff's burden to come forth with a causal connection. There is. I mean, if I am in a car accident and develop cancer within a week, I can't just assume that it's causally connected to the car accident. I agree. And there's two problems going on here. One is the causal question and one is the question of these witnesses. Because these witnesses were necessary to establish the damages on the bridge county. Well, was the ‑‑ whoever wrote the report, was that witness causally connecting? No. These were not proximate cause witnesses. Okay. These were not proximate cause witnesses. These were people that were testifying as to what it was going to cost to tear the house down and rebuild it, simply establishing the amount of the cost of the remedy. But you can't get to B before, you know, before A. You have to connect. That seemed to be the argument in trial, but I'm not aware of any rule that says I have to put my evidence on in any particular order. Because at the end of the day, if they testify to damages and I still don't have proximate cause evidence in play, the case is still going to be dismissed. So that damage testimony was necessary, if for nothing else, the breach of warranty. And yet it was denied to be put into evidence. Who was going to connect causation for you? The jury. The jury? Well, and, Your Honor, that's the thing. I've got a list here of things that the question here was, was the court authorized to take that issue away from the jury? Because this was a jury trial. Well, only as to the claims of negligence of warranty. The Illinois Consumer Fraud Act is a non-jury. Correct. And what I feel in my cross-appeal is the dismissal of the three common law claims. As far as, count two was for negligence for overspray. For overspray? For overspray, getting this on the roof. Who would have given testimony on that? There was testimony on that. And, in fact, the contractor sent someone out to try to fix it. And their remedy was to spray paint the shingles, which he admitted was improper. Was that that Tim? Tim Taylor, I think. I don't know if he was the one that came out to fix the shingles. But even the defendant testified this was improper. But the question is. . . So, was there a damage element that you were denied that specifically addressed the overspray? We weren't allowed any testimony other than the plaintiff's in this case. Who was your causation witness? Well, that's with regard to count two is what was amazing. You've got a product sitting in a bucket. It ends up on the roof. The only thing in between them is the applicator. Do we really need an expert to say that this material did not uncase itself and jump on the roof? Doesn't that raise an ambiguity about whether this is a product action or an application action or a combination thereof? I don't think so. Because how does a product that you're trying to apply here end up here? How is that a problem with the problem? That's a problem with the person spraying it on the wall, maybe in high wind. Or as the defendant actually said on the witness stand, not paying attention, which is an action. Well, then, did you explicitly go on a theory and present to the jury a theory of causation by the applicator who was hired by this named defendant? Yes. That was our claim was that this was caused by the applicator. Yeah, I realize. Okay. But was there testimony in the record specifically setting this out step-by-step causation? Yes, sir. When it came into play, there was testimony on page 561 of the record by Sheriff Smith and Speth that they were applying this at one time when it was raining. The defendant on the witness stand said that was totally inappropriate, that you have to wait for the logs to dry out. So we have one piece of evidence that shows that they were applying it in weather conditions that were improper. And then that was by whom? Who gave that testimony? The plaintiff testified that it was happening in the rain and the defendant admitted that it was not supposed to be applied when those logs were wet. So Mr. Roberts would have given you expert testimony that it was improperly applied in the rain? If it was being applied in the rain, that was improper. And she testified it was being applied. He was never there. No, but just generally, he could testify that you don't put this on when there's wet weather. Sure. That's his job. And then did he, was he asked the next question such as, and if it were, would it cause this to have peeled, chipped, flaked, whatever? I don't know that anybody knew that. That was the problem. When we started this case, we disclosed, you asked about disclosures. When we started this case, we disclosed early on that we did not know of any remedy at that time other than possibly tearing this house down. Because these logs are structural. They're inside and outside. You can't just remove the exterior siding like you would on a brick house. And we formed them seven years before trial. This may be a possibility. And then a year before trial, we submitted the bids to tear the house down and to rebuild the house, which was a supplement. So when you got these bids, they just presumed that the house has to be torn down and rebuilt. So that's what the bids were for. You gave a hypothetical, I want you to assume that this house has to be demolished and rebuilt. No, we stated expressly in our answers to interrogatories that that was what we were looking at. We were looking for other possibilities, but ultimately, if we couldn't find one, that would be what would have to be done. But who came up with that conclusion? You or an engineer, structural engineer, for example? No, Your Honor, it has to do with the way a log house is constructed, whereas we have studs. I understand. I don't know much about that. But what I'm saying is, when you say we decided we needed a new house, did a structural engineer come in and tell you that? Or was that your conclusion or your client's conclusion? How did that conclusion come about? It came about because the clients testified that they had looked for alternatives to fix the problem and could not find any. And what were those alternatives? There weren't any. That's what I'm saying. Did they testify to any company or was there any evidence brought forth of these, I take it, experts that had looked at the problem and said, no, it can't be rectified? The defendant himself testified on the witness stand. He knew of no way whatsoever to fix this. Yeah, but he didn't say that it was caused. The problems were caused by his product. Well, and it gets down to how do you prove a negative? If nobody can come in and say, we think this is the cause. Nobody could come in and say that? No. We searched. I mean, I personally searched. I did everything under the sun for six years. So how is the court then to allow a verdict to go forward if you're saying that nobody could causally connect it? And that's what I think, based upon the evidence, and I think one of the crucial things here was the wording of the language of the warranty. It says the warranty is valid only when the liquid site material is applied by ProCraft Essential Illinois approved applicators and the manufacturer's approved methods and only if the application surface is prepared as directed by the manufacturer. That certainly suggests that if they do what they're supposed to do, they're going to warranty this thing. And if it went wrong, I think there's a presumption. Mr. Standards, I'm going to stand up, but it has nothing to do with you. Did that bother you? No, not at all. She has a back issue that she feels more comfortable with. I know what those are like. I've been through that. Thank you. I'm sorry. It's suggesting that they have to follow procedure or the warranty's no good. That's why our warranty claim and our negligence claim were pled in the alternative. If they follow proper procedure, the warranty covers it and they breach the warranty because, as you pointed out, the warranty covers both the application and the product. But if the warranty is in place and they follow all the procedures, they need to pay us under the warranty. If they didn't follow the procedures, that's negligence. But the warranty also doesn't apply because the warranty only applies if they follow procedure. So I think the warranty itself makes it one or the other. It certainly suggests that if something goes wrong, it says if we do all these things, you have a warranty guaranteeing it won't peel, bubble, crack, and fade. And it did those things. Do you know why, in the first place, they had this product applied or they sought to have this treatment for their loved one? It's low maintenance. It's kind of like a vinyl. It's like the thickness of a credit card. They called it like a stucco application. I mean, was it going to be – was it clear? It's about like a credit card type of plastic when it dries. But I mean, it didn't change the whole look or structure of the log house. It was supposed to just seal it. Is that the idea? No, it actually brings the whole log house to a single coat. So you no longer have the rounded – Oh, it's still rounded. Oh. It still contours to the shape of the house, but it simply coats the log so they're no longer rough. They're smooth. It puts a smooth surface on it. But it's also – that's another factor in this. When Mr. Black said this was used to put on log homes, testimony to show this was the first time they ever put this on a log house. This had never been done before. I saw that. What about this mold issue that then arose? This is a sealant type of thing. Well, that's the question. It was failing, obviously, because there was water behind it, which is causing the bubbles. And then there was water collecting in the bubbles. And Mr. Speth testified that the mold that was showing up was along the seams. See, but what concerns me is all this information you just gave us about the water and this and that happening. That's what a structural engineer, I would think, would be called to do, examine that, take cuts, see how much water is coming in. The problem is what made it fail? Well, that's the question. And that's the question that, quite honestly, I mean, I tried contacting chemical engineers. This is a very unique product that nobody understood it. Nobody had ever seen it before. So trying to find somebody that would touch it with a ten-foot pole, like, we don't know what makes this stuff tick. And given the testimony of the lack of supervision on the job, the fact that they had messed up on the roof already certainly showed that the applicators were being somewhat negligent in the way they put it up. What does that mean? I'm sorry? What does that mean, the roof? They were one of the counselors for negligence. When they were spraying on the walls, they got some of this overspray on the roof. It wasn't supposed to go on the roof at all. It wasn't supposed to go on the roof. And we asked about whether they were doing it in high wind. And the defendant said, well, if they were, it wasn't appropriate. Either that or he just wasn't paying attention. Well, if he's not paying attention, that's negligence. So they had already messed up the way they were applying it when they were doing the second story from, you've got the two-story house that's part of it, one story here, and they're staying on this roof to spray these walls. So you've already shown that they were not really doing a good job there. You've got the problem they're applying it in the rain. You've got the problem they had a lack of supervision because the contractor was never there and the guy he hired was there less than half the time to supervise the other guys. So it sounds like you used the defendant to act as your expert. He was the closest thing anybody had to an expert. But Roger Roberts, when he testified about trying to get the water out and he was cutting these bubbles loose to let that water out, he testified that he noticed that the thickness of the material varied greatly all around the house. There was no uniformity with this. So that appears to be an application issue. The question is, was there enough to let a jury have that? Because Illinois Pattern Jury Instruction 1.01 says, you may use common sense gained from your experiences in life in evaluating what you see and hear during trial. One of the cases we cited, the Carter case, said specifically, causation may be established by facts and circumstances which, in the light of ordinary experience, reasonably suggest that the defendant's negligence operated to produce the injury. And we felt like there were enough factors here to at least hand this to a jury. The question is, was it so lacking she had a right to take it away? This person who testified about cutting into the bubble, is that the person that was not allowed to testify? No, that was their... That was plaintiff. That was Roger Steff, plaintiff. Well, the plaintiff testified to that. Yeah, because he couldn't get anybody after him to fix it. Does he have any kind of technical background, Mr. Speck? No. I mean, this was observation because these bubbles are anywhere from this big to this big popping out of this house. So when he'd have water in them to relieve the water, keep that from soaking involved, he would cut them out to relieve the water. And when he cut those bubbles off, he noticed sometimes it was that big, sometimes it was about that big. So he was simply testifying to what he observed. He wasn't giving expert testimony, just an observation. Just a layup. Did the judge direct the verdict at the close of all the evidence? Actually, I think she directed the verdict on the two negligence counts first. And when we got to doing jury instructions, she was going to leave the breach count in. But when we started doing it, that was at the end of the second day of trial. When we started doing the jury instructions and we got down to damages, she realized that she had blocked the testimony to establish the amount of damages because proximate cause wasn't an issue in the breach count. And she had blocked that testimony claiming that we had not established proximate cause. But that testimony wasn't meant to go to proximate cause. So in essence, what they said was you can testify to what your remedy is, but we're not going to let you testify to what that remedy is going to cost, and then I'm going to dismiss your case for not having any testimony of what it's going to cost. That didn't make any sense to me. Why did she say that the proximate cause doesn't apply to the warranty? Oh, I'm saying that. You're saying that? Yes, I'm saying that. She never said that. She never said that. And that was the problem. She had blocked that testimony because of proximate cause. But when it came time for the warranty, I mean, it's not in the record. She checked that out. They breached this contract. But the problem is she did not allow the people that were going to testify to what the cost of the remedy the plaintiff had requested at trial. So we had nothing to base it on. I think this is when you asked the question earlier about the consumer fraud. I think at the end of the day, she chose $40,900 because that was what they bargained for and they did not get the benefit of that $40,900. So she said give them their money back. I think it could have been more than that had there been any damage testimony that the cost of repairing the house was greater. But anything over $40,900 would have been pure speculation because she had disallowed that testimony from happening. How much do you think it would have cost to tear down and rebuild? $120,000? Roger Roberts blurted it out, and they stopped him from testifying what he thought it was the cost of what he wanted. But he didn't blurt it out on the stand. It was about $600,000. This is a big house. This is a very big home. And that's what those witnesses collectively— that was the approximate total of what they were going to testify. Wasn't it a Southern—what was the brand name? Southern Log Homes or— Southeastern. Southeastern. It's a fairly well-known log home company, as I recall. Well, never mind. So we're just asking for a new trial on the three common law counts. We're asking for that. You're asking for a new trial on all? The three common law counts. The three that were dismissed.  Thank you, Your Honor. Thank you. Briefly. So everybody on rebuttal always tell the court briefly? Yes. Usually. Whenever you want to stop, it's okay. We don't hold you to it. Okay. Just a couple things. Justice Chapman, you were asked a question, and this application is sort of like a clear coat on your car. Okay. That's basically what it is. It's just sprayed on, and it's over the log, and it kind of provides a clear coat. It threw me off when I read somewhere where it was like stucco or something like that. It's not like that. It really threw me off. You think it's stucco? Yeah, but it's like a clear coat. That finished product is like a clear coat. I think there was some testimony that it's like the coating of a credit card. A couple things. First, I want to address the overspray. There was testimony of overspray onto the shingles, but Judge Soberson also discussed that there was no testimony as to what it would cost to repair the shingles or replace the shingles or anything of that nature. There's no question that the applicator, and he was a certified applicator, got some on the shingles, but there was no damage testimony as to what it was costing. I think the courts picked up on the thing about structural engineers, and that was how we talked about Judge Soberson picked on it. There needed to be some testimony to connect the two, and I realize that Walter Kelsey has passed away, but I'm sure there is someone out there, his protege, that could find something that, you know, and then I think, as I told her, I think if that would happen, then the burden would switch to me or shift it for me to provide some, you know, testimony that it was applied or didn't cause anything of that nature. So I think the court, sad as it may be, the direct verdict, and it was at the close of the plaintiff's case, by the way. There was no causal connection. There was no testimony, and as the court says, what the plaintiffs thought or what they, you've got to have testimony at trial. We've all been there. I mean, it's, you just can't walk in and say, hey, I think this is, I want a new house because this stuff didn't get applied right. You have to have it. Now, under some circumstances, you might want to do it. If they had some testimony of an expert that says, I knew how to build a log home, I'm a contractor, this is what it would take to repair it, and Judge Solverston clearly, under those other counts, said that there was no testimony and that's why she corrected it. And I would ask that, and I think her correcting it was correct, but since there was no damages, the court, of course, should reverse the award under the consumer court aspects of it. Unless you have any questions, I'll be very brief. Thank you very much. Thank you, Mr. Byer. This case will be taken under advisement and will disposition of the issue to the courts, and the court is going to take a recess for 15 minutes.